CASE NO. 2012-1463, -1501

UNITED STATES COURT OF APPEALS
FOR THE FEDERAL CIRCUIT

CHEESE SYSTEMS, INC.,

Plaintiff/Counterclaim Defendant-
Appellant,

CUSTOM FABRICATING AND REPAIR, INC.

Counterclaim Defendant-
Appellant

v.

TETRA PAK CHEESE AND POWDER SYSTEMS, INC.
and TETRA LAVAL HOLDINGS & FINANCE S.A.,

Defendants/Counterclaimants-
Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN
CASE NO. 11-CV-00021, THE HONORABLE BARBARA CRABB

REPLY BRIEF OF PLAINTIFF/COUNTERCLAIM DEFENDANT-
APPELLANT CHEESE SYSTEMS, INC. AND COUNTERCLAIM
DEFENDANT-APPELLANT CUSTOM FABRICATING & REPAIR, INC.

James F. Boyle
John P. Fredrickson
Michael T. Griggs
Eric J. Lalor
Boyle Fredrickson, S.C.
840 N. Plankinton Avenue
Milwaukee, WI 53203
(414) 225-9755

Attorneys for Plaintiff/Counterclaim
Defendant-Appellant
Cheese Systems, Inc. and
Counterclaim Defendant-Appellant
Custom Fabricating & Repair, Inc.

October 29, 2012

# TABLE OF CONTENTS

I.    Tetra Pak Has Failed To Rebut the *Festo* Presumption of Surrender .............1

    A.    Tetra Pak Cannot Rebut the *Festo* Presumption Under the "Tangential" Exception Because It Cannot Identify Any Rationale for the "Generally Common Plane" Language in the Prosecution History ....................................................................1

        1.    The "Generally Common Plane" Limitation Was Not Necessary To Ensure that Cutting Edges and Stirring Edges Were on Opposite Faces of an Agitator Panel...........................................2

        2.    The Prosecution History Provides No Rationale for How the "Generally Common Plane" Limitation Helped Distinguish the Claims of the '347 Patent Over the '504 Patent .........................3

    B.    A Putative Equivalent Is Not Unforeseeable Merely Because It Is Not Found in the Prior Art ..........................................................5

II.    Tetra Pak's Evidence Fails To Establish that It Is Entitled to Judgment of Infringement Under the Doctrine of Equivalents as a Matter of Law.............9

III.    The All Elements Rule Bars Infringement Under the Doctrine of Equivalents ................................................................................................11

IV.    Tetra Pak's Proposed Interpretation of "a Plurality of Edges Disposed in a Generally Common Plane" Is Not Supported by the Record.......................12

V.    There Is No Infringement Under the Proper Interpretation of "Agitator Panel".................................................................................................14

VI.    There Is No Infringement Under the Proper Interpretation of "Horizontally Disposed Axes" .................................................................................16

VII.    The Asserted Claims of the '347 Patent Are Invalid....................................18

    A.    The '509 and '907 Patents Anticipate the '347 Patent........................18

    B.    The '559 and '907 Patents Render the '347 Patent Obvious ..............22

    C.    The AT '523 Patent Renders the '347 Patent Obvious .......................24

VIII.    Tetra Pak Was Not Prejudiced by the Stricken Expert Testimony ...............26

i

# TABLE OF AUTHORITIES

**Cases**

*3M Innovative Props. Co. v. Avery Dennison Corp.*, 350 F.3d, 1365 (Fed. Cir. 2003) ...............................................................................................17

*Akzo N.V. v. U.S. Int'l Trade Comm'n*, 808 F.2d 1471 (Fed. Cir. 1986) ................24

*Boehringer Ingelheim Vetmedica, Inc. v. Schering-Plough Corp.,* 320 F.3d 1339 (Fed. Cir. 2003)...................................................................................10

*Energy Transp. Grp., Inc. v. William Demant Holding A/S*, No. 2011-1487, 2012 WL 4840813 (Fed. Cir. Oct. 12, 2012)..............................................................1, 5

*Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co., Ltd.,* 344 F.3d 1359 (Fed. Cir. 2003) ...............................................................................................1, 7

*Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co., Ltd.,* 493 F.3d 1368 (Fed. Cir. 2007) ...................................................................................................6

*Freedman Seating Co. v. Am. Seating Co.,* 420 F.3d 1350 (Fed. Cir. 2005) ..........11

Honeywell Int'l v. Hamilton Sundstrand Corp., 523 F.3d 1304 (Fed. Cir. 2008).......................................................................... 5, 7, 8

*KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398 (2007) ...............................................24

*Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) ........................................8

*U.S. Philips Corp. v. Iwasaki Elec. Co. Ltd.*, 505 F.3d 1371 (Fed. Cir. 2007) .......17

*United States v. Adams*, 383 U.S. 39 (1966)...........................................................24

I.     **Tetra Pak Has Failed To Rebut the *Festo* Presumption of Surrender**

Tetra Pak does not dispute that the *Festo* presumption applies.  Moreover, Tetra Pak cannot rebut the presumption.

A.     **Tetra Pak Cannot Rebut the *Festo* Presumption Under the "Tangential" Exception Because It Cannot Identify Any Rationale for the "Generally Common Plane" Language in the Prosecution History**

This Court recently emphasized that rebutting the presumption of the surrender of claim scope under *Festo* "requires a strong showing . . . to satisfy the 'very narrow' exception to prosecution history estoppel for amendments only tangentially related to the equivalent in question." *Energy Transp. Grp., Inc. v. William Demant Holding A/S*, No. 2011-1487, 2012 WL 4840813, at *14 (Fed. Cir. Oct. 12, 2012). Assessing whether Tetra Pak has made a sufficiently strong showing to meet its burden under this narrow exception requires determining if there is an objectively apparent reason for the narrowing amendment, which "should be discernible from the prosecution history record." *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co., Ltd.,* 344 F.3d 1359, 1369 (Fed. Cir. 2003).

In an effort to conjure such a rationale from the prosecution history for the addition of the "generally common plane" limitation, Tetra Pak misrepresents the impact of the "generally common plane" language and ignores the total absence of any explanation directed specifically to this limitation.

1

**1.      The "Generally Common Plane" Limitation Was Not Necessary To Ensure that Cutting Edges and Stirring Edges Were on Opposite Faces of an Agitator Panel**

The explanation now offered by Tetra Pak as the reason for the "generally common plane" amendment – to clarify that the cutting face of the agitator panel could only have sharp edges, while the obverse could only have blunt edges – is not found anywhere in the prosecution history. It is an after-the-fact rationalization that is not "discernible from the prosecution history record."

Additionally, there is no factual basis for Tetra Pak's characterization that "[b]efore the amendment, the claim language did not prevent having both cutting edges and stirring edges on either face of an agitator panel." (Tetra Pak Br. 24). Set forth below is the language of application claims 1 and 13 as it pertains to agitator panels after the September 24, 1998 preliminary amendment and before the amendment in question:

1.      each agitator panel including a cutting face having a plurality of sharp cutting edges and an opposite stirring face having a plurality of blunt stirring edges;

13.      (4) providing each panel with a cutting face having a plurality of sharp cutting edges and an opposite stirring face having a plurality of blunt stirring edges

(A200-01). As is readily apparent, prior to the amendment in question, the limitation requires that the sharp cutting edges and the blunt stirring edges be on opposite faces of the agitator panel. The addition of the "generally common plane"

2

language only clarifies the relation of the plurality of cutting edges to one another and the relation of the plurality of stirring edges to one another – that they be in respective generally common planes – but does not further define or clarify the relation of the cutting edges to the stirring edges.

Tetra Pak's erroneous characterization is further undermined by the claim language that was added to both of the independent claims at the same time as the "generally common plane" limitation, namely a "means for mounting said panels with respective cutting and stirring edges oriented such that during rotation only the stirring edges of the panels or only the cutting edges of the panels are moving toward the common volume." (A230-31) (a similar amendment was made to application claim 13). It is this language, and not the "generally common plane" language, that prevents cutting edges and stirring edges from being on the same face of a panel.

> **2.     The Prosecution History Provides No Rationale for How the "Generally Common Plane" Limitation Helped Distinguish the Claims of the '347 Patent Over the '504 Patent**

Despite the fact that the prosecution history indicates in multiple places that the "generally common plane" language was added by amendment to patentably distinguish application claims 1 and 13 over the '504 patent (A211, A215, A232,

A233 (by negative implication in the last instance)),[1] neither the applicant nor the patent examiner explained how having the sharp cutting edges on one face of the panel in a common plane and the blunt stirring edges on the opposite face of the panel in a second common plane helped distinguish over the '504 patent. Tetra Pak quotes from the remarks in the March 2, 1999 Amendment (Tetra Pak Br. 25-26) in an attempt to support its argument. However, the quoted passage is directed toward the "means for mounting" limitation and the operational differences between the '347 patent and the '504 patent and does not reference the "generally common plane" limitation. Nor does it explain how defining the orientation of the cutting edges in relation to one another or defining the orientation of the stirring edges in relation to one another distinguishes over the '504 patent.

Even if the "generally common plane" limitation helped clarify that the sharp cutting edges and blunt stirring edges were on opposite sides of the agitator panel as Tetra Pak erroneously suggests, that clarification would not help distinguish over the '504 patent because it had the same arrangement. The '504 patent discloses panels with blades "sharpened on one side only and fixed in such a way that if the shaft is rotated in one direction then the sharp edges of the blades will be presented to the food product and cutting will take place; whereas, if the

---

[1] Tetra Pak continues to imply, via footnote 7, that the "generally common plane" limitation was added for purposes of § 112, but as discussed herein, both the examiner and the applicant confirm that the amendment was made to at least help patentably distinguish over the prior art.

shaft is rotated in the other direction the blunt sides of the blades will be presented to the food product and stirring will take place." (A1024).

The prosecution history thus fails to state any plausible explanation for the addition of the "generally common plane" limitation beyond the vague assertion that it helped distinguish over the prior art. According to the recent Federal Circuit opinion in *Energy Transp. Grp.,* when a limitation is added in response to a prior art rejection, and there is no further explanation for the limitation in the prosecution history, the patentee cannot make the strong showing necessary to rebut the presumption of surrender. *Energy Transp. Grp., Inc.*, 2012 WL 4840813, at *14; *see also Honeywell Int'l v. Hamilton Sundstrand Corp.,* 523 F.3d 1304, 1315–16 (Fed. Cir. 2008) ("If the prosecution history reveals no reason for the narrowing amendment, the presumption is not rebutted. . . . Silence does not overcome the presumption.") (internal citation omitted).

### B.   A Putative Equivalent Is Not Unforeseeable Merely Because It Is Not Found in the Prior Art

Tetra Pak does not dispute that in the district court it failed to offer any evidence concerning the foreseeability of curved agitator panels beyond the vague assertion that curved panels "were not generally known in the prior art." (A1625). In response to CSI's initial brief pointing out this shortcoming, Tetra Pak has still failed to identify any evidence in the record regarding the understanding of a hypothetical person of ordinary skill in the art at the time of the amendment with

5

respect to the foreseeability of the alleged equivalent, namely agitator panels with curved cutting and stirring edges. Tetra Pak's suggestion that such evidence is unnecessary when the equivalent is not found in the prior art is contradicted by the law regarding foreseeability as explained by this Court.

In an effort to support its position, Tetra Pak mischaracterizes *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co., Ltd.,* 493 F.3d 1368 (Fed. Cir. 2007). The issue before the Court in *Festo* was whether a supposed equivalent disclosed in the pertinent art at the time of the amendment must meet the function/way/result or insubstantial differences test in order to be held to be foreseeable. The Court held no, an equivalent need not meet the function/way result test to be foreseeable, stating simply, "an alternative is foreseeable if it is disclosed in the pertinent prior art in the field of the invention." *Id.* at 1379. The Court emphasized, however, that its holding was limited to the facts before it: "We have no occasion here to determine in what other circumstances an equivalent might be foreseeable." *Id.* In other words, while an equivalent disclosed in the prior art is sufficient to establish that it is foreseeable, there is no basis for relying on *Festo* for the converse – the proposition relied on by Tetra Pak – that an equivalent not disclosed in the prior art is therefore unforeseeable as a matter of law.

Tetra Pak has tried to spin the impact of the holding in *Festo* in its favor by distorting the Court's opinion in the prior *Festo* decision by ignoring the word

"usually." In its brief, Tetra Pak suggested the Federal Circuit has adopted a bright line test:

> As this Court stated in *Festo*, later-developed technology or technology that is unknown in the art is unforeseeable. *Festo*, 344 F.3d at 1369.

(Tetra Pak Br. 23). But here is what this Court actually stated:

> *Usually*, if the alleged equivalent represents later-developed technology . . . or technology that was not known in the relevant art, then it would not have been foreseeable. In contrast, old technology, while not always foreseeable, would more likely have been foreseeable. Indeed, if the alleged equivalent were known in the prior art in the field of the invention, it certainly should have been foreseeable at the time of the amendment.

*Festo,* 344 F.3d at 1369 (emphasis added). The Court's use of the word "usually" unmistakably indicates that technology not known in the relevant art at the pertinent time may nevertheless be foreseeable, and Tetra Pak's disregard of the word "usually" distorts the meaning of the opinion.

The Court explained in *Honeywell Int'l, Inc. v. Hamilton Sundstrand Corp.*, 523 F.3d 1304 (Fed. Cir. 2008), that later-developed technology may nevertheless be foreseeable:

> The timing of Sundstrand's product development does not settle the issue. The record shows that Sundstrand developed its equivalent between 1991 and 1995, after the relevant amendments in 1982-83. *The mere temporal relationship of the equivalent to the patent acquisition and amendment process, however, does not make the equivalent unforeseeable.*

*Id.* at 1313 (emphasis added). According to the Court in *Honeywell,*

"[f]oreseeability does not require . . . that any equivalent exist at the time; rather foreseeability only requires that one of ordinary skill in the art would have reasonably foreseen the proposed equivalent at the pertinent time." *Id.* at 1314.

Tetra Pak's contention that curved agitator panels were unforeseeable at the time of the amendment is further undercut by its argument that the proper construction of the term "generally common plane" encompasses "edges lying on a . . . continuing curved surface." (Tetra Pak Br. 32). The primary objective of claim construction is to ascertain the meaning of claim language to a person of ordinary skill in the art at the time of the invention. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312-13 (Fed. Cir. 2005). By arguing that a person skilled in the art would understand the language "edges disposed in a generally common plane" to mean "edges lying on a . . . continuing curved surface," Tetra Pak admits that curved agitator panels, i.e., panels with edges lying in a curved surface, were at least foreseeable, if not contemplated.

Accordingly, Tetra Pak's proof that the claimed equivalent (curved agitator panels) did not exist in the prior art fails to satisfy Tetra Pak's burden of proving that they were not foreseeable at the time of the amendment, and Tetra Pak's failure to offer any evidence at all concerning what one of ordinary skill in the art would have reasonably foreseen at the time of the amendment therefore compels

the conclusion that Tetra Pak failed to rebut the presumption of surrender under the "foreseeability" prong.

## II.   Tetra Pak's Evidence Fails To Establish that It Is Entitled to Judgment of Infringement Under the Doctrine of Equivalents as a Matter of Law

Tetra Pak makes no serious effort to explain how it is entitled to judgment as a matter of law under the doctrine of equivalents. For example, in addition to arguing generally that Tetra Pak failed to offer the required particularized testimony and linking argument, CSI's principal brief specifically pointed out that Tetra Pak offered no evidence about how CSI's curved cutting and stirring edges affect the coagulum in comparison to the straight edges of the claimed invention. Instead of identifying any relevant evidence in the record, Tetra Pak tries to shift the burden of proof by arguing that CSI offered no counter evidence and to summarily dismiss the topic as "not a legitimate distinction." (Tetra Pak Br. 29). Tetra Pak simply ignores its failure to provide any evidence on the subject.

Further, the disparate treatment given by the district court to the parties' respective experts is startling, especially given that the patentee bears the burden of proving infringement. The district court embraced Tetra Pak's expert, even though he i) never observed the accused HSCV in operation or performed any tests (A781), and ii) failed to address the specifics of equivalence. In contrast, the district court dismissed the testimony of CSI's experts out of hand, even though they did observe both curved and flat cutting and stirring surfaces in operation,

concluding their opinions were i) conclusory, ii) unreliable because no tests were performed, and iii) irrelevant based on a misunderstanding of *Boehringer Ingelheim Vetmedica, Inc. v. Schering-Plough Corp.,* 320 F.3d 1339 (Fed. Cir. 2003). If the opinion of Tetra Pak's expert is deemed sufficiently specific and reliable to satisfy its burden of production (which it is not), then the opinions of CSI's experts, which are more specific and based on personal observation of the competing technologies in operation, should be considered by the finder of fact on the question of equivalence rather than having the district court weigh competing expert testimony at the summary judgment stage.

Tetra Pak justifies writing off the observations of CSI's experts because they "only tested its HSCV against *co-rotating* vats," (Tetra Pak Br. 28). Tetra Pak's argument misses the point because the relevant issue with respect to the doctrine of equivalents is the impact of curved vs. straight cutting and stirring edges, not the direction of rotation of the panels. Thus, observations of how the edges interact with the coagulum would be informative to the question of equivalence regardless of whether the panels observed are co-rotating or counter-rotating. If anything, Tetra Pak's argument should be considered by the factfinder in determining how much weight should be accorded to CSI's expert's opinion, and balanced against the fact that Tetra Pak's expert *never* observed the HSCV with curved blades in operation.

10

### III. The All Elements Rule Bars Infringement Under the Doctrine of Equivalents

Tetra Pak misconstrues CSI's argument regarding the all elements rule. Contrary to Tetra Pak's assertion, CSI is not arguing that *any* degree of curvature avoids infringement under the doctrine of equivalents. The Federal Circuit in *Freedman Seating Co. v. Am. Seating Co.,* 420 F.3d 1350, 1360 (Fed. Cir. 2005), explained that the all elements rule bars a finding of equivalence when there is a "clear, substantial difference or a difference in kind" between the claim limitation and the accused product. As seen in the following photograph of the HSCV blade assembly, the cutting edges contact the plane defined by the table surface at only four points.



Simple observation of the accused CSI blade assemblies reveals that its cutting and stirring edges are substantially curved in two directions (parallel and perpendicular to the axis of the vat) such that there is a clear, substantial difference between the curved cutting and stirring edges of the accused HSCV and a surface that is "on the whole flat, but include some amount of curvature." While there may be some lesser degree of curvature of cutting and stirring edges that is outside the literal scope of the claim, but still within the range of allowable equivalents, the cutting and stirring edges of the accused HSCV are definitively beyond any reasonable boundary of equivalents.

## IV.    Tetra Pak's Proposed Interpretation of "a Plurality of Edges Disposed in a Generally Common Plane" Is Not Supported by the Record

According to Tetra Pak, a curved surface can be a "generally common plane." The dictionary definition of "plane" is:

> *a* **:** a surface in which if any two points are chosen a straight line joining them lies wholly in that surface

> *b* **:** a flat or level surface

*See* Merriam-Webster, http://www.merriam-webster.com/dictionary/plane (last visited October 26, 2012). Yet without identifying anything in the intrinsic record that would indicate the applicant had a different understanding of the word, Tetra Pak argues that "a plurality of edges disposed in a generally common plane" includes "two or more sharp (or blunt) edges lying on [a] continuing curved

surface." (Tetra Pak Br. 32). The patent does not show or describe a panel with curved cutting or stirring edges, nor does the patent anywhere suggest that a "plane" was intended to mean anything other than a flat surface. None of the justifications offered by Tetra Pak for its construction withstand scrutiny.

The notion that the "generally common plane" language focuses on the position of the cutting edges on opposite surfaces of the agitator panel (*see* Tetra Pak Br. 32-34) has already been disposed of. As explained at pages 2-3 above, even before the amendment adding the "generally common plane" language, application claims 1 and 13 required that the sharp cutting edges and the blunt stirring edges be on opposite faces of the agitator panel. (A200-01).

Further, there is no legal support for Tetra Pak's suggestion that the plain meaning of claim language can be ignored so long as the function of the claimed element is achieved. Tetra Pak contends that the generally common plane limitation "permits a degree of curvature up to the point at which the remaining limitations in the claims are not defeated." (Tetra Pak Br. 33-34). While it certainly is proper to consider the functions of an invention when determining the meaning of particular claim language, that is a far cry from Tetra Pak's argument that the plain meaning of the claim language can be ignored provided the overall function of the invention is achieved. There is no legal support for Tetra Pak's argument.

## V.    There Is No Infringement Under the Proper Interpretation of "Agitator Panel"

Contrary to Tetra Pak's accusation that CSI has committed the "cardinal sin" of claim construction of reading the preferred embodiment into the claim, CSI does not contend that the lone embodiment disclosed in the patent limits how "agitator panel" should be construed. CSI's proposed definition – "the assembly including all cutting edges and stirring edges that rotates about a common axis of rotation" – encompasses not only a single, unitary agitator panel as disclosed in the '347 patent, but also can reach at least a shaft with multiple, distinct blade assemblies, as in the '504 patent.

The construction of "agitator panel" is informed by the discussion of the '504 patent in the prosecution history.  At the November 10, 1998 interview, the examiner raised patentablity concerns regarding the '504 patent, which discloses multiple blade assemblies (called "agitator paddles" in the '504 patent) arranged on a single shaft. (A1018). To address those concerns, the examiner and the applicant tentatively agreed to (1) amend "agitator panel" to "single unitary agitator panel," and (2) define the cutting edges and stirring edges as lying in respective "common planes." (A210-11). The examiner must have understood that "agitator panel" did not refer to just one of a number of blade assemblies rotating about the axis. Otherwise, the proposed "single unitary agitator panel" amendment would not distinguish over the '504 patent because each individual paddle in the vat disclosed

14

in the '504 patent would be an "agitator panel" under the district court's interpretation of that term.

Tetra Pak seizes on the fact that it ultimately declined amending the claims to require a "single unitary panel," arguing that CSI's proposed construction is therefore foreclosed. Contrary to Tetra Pak's argument, an agitator panel can easily meet CSI's proposed meaning without being a "single unitary panel." For example, an agitator panel could be comprised of several distinct paddles (the term used in the '504 patent) with cutting and stirring surfaces rotating about a single axis, spaced apart, yet all in alignment so all of the cutting edges and stirring edges are disposed in respective generally common planes.

Tetra Pak's argument that "agitator panel" is a term of art rests on a blatant mischaracterization of its expert's declaration. In paragraph 9 of his declaration, Donald McMahon stated:

> Those of ordinary skill in the art understand the term "agitator panel" to mean the structures in a food processing or cheese vat for cutting, stirring and mixing. When referring to horizontal cheese vats, agitator panels are the structures mounted on the axis of the vat that cut, stir and mix the cheese curd.

(A1664).[2]  Nothing in this assertion from Dr. McMahon regarding agitator panel as a term of art conflicts with CSI's proposed interpretation.

---

[2] CSI presumes this declaration to be what Tetra Pak intended to reference at page 36 of its brief.

Finally, contrary to Tetra Pak's argument, the "generally common plane" language was not necessary "to distinguish the operational differences between the '347 and '504 patents." As discussed above, the "generally common plane" language addresses the relation of the sharp cutting edges to one another and the relation of the blunt stirring edges to one another, and has nothing to do with ensuring that only stirring edges or cutting edges pass through the coagulum at one time, on which Tetra Pak seems to be fixated. Instead, using CSI's proposed construction, the "generally common plane" limitation did serve to distinguish the structure of the '347 patent over the '504 patent, in that all of the cutting and stirring edges in the '347 patent are disposed in respective generally common planes, whereas all of the cutting and all of the stirring edges of each paddle of the agitator panel in the '504 patent do not lie in the same respective generally common plane—they are radially offset from one another.

Tetra Pak does not dispute that the HSCV does not infringe the '347 patent under CSI's proposed interpretation of "agitator panel."

## VI.    There Is No Infringement Under the Proper Interpretation of "Horizontally Disposed Axes"

Tetra Pak argues that CSI presented an "untimely" construction of "horizontally disposed axes," but CSI is merely applying the plain and ordinary meaning of the term, which did not require asking the district court for a special construction. Instead, it is Tetra Pak that is arguing that "horizontally disposed"

16

should be considered a term of art that controls the meaning of the claim. Tetra Pak, however, again mischaracterizes the record with respect to the understanding in the art of "horizontally disposed." Neither of the Proposed Findings of Fact Tetra Pak cited even mention the term. (Tetra Pak Br. 39, referencing A1664, ¶ 7; A1759, ¶ 15). Tetra Pak also looks to the background of the '504 patent for support, citing a single, passing reference to "horizontally disposed" axes. But it takes far more than a single reference in the prior art to establish that claim language is a term of art that should be given some meaning other than its plain and ordinary meaning. Aside from these references, Tetra Pak's brief offers no evidentiary support for its conclusion that "horizontally disposed" has any specific meaning to persons of skill in the art.

Tetra Pak's reliance on *3M Innovative Props. Co. v. Avery Dennison Corp.*, 350 F.3d, 1365, 1373-74 (Fed. Cir. 2003) to downplay the absence of "generally" from the claims as a modifier for "horizontally disposed" is misplaced because that case did not address the issue of the presence or absence of a modifier like "generally." It is well understood that the use of similar terms, such as "approximately," serve to expand the literal scope of the claim. *U.S. Philips Corp. v. Iwasaki Elec. Co. Ltd.*, 505 F.3d 1371, 1379 (Fed. Cir. 2007). Hence, the absence of the modifier "generally" (used repeatedly elsewhere in the claims) indicates a narrow literal claim scope was intended.

17

Tetra Pak does not dispute that the horizontal axes of the HSCV are inclined with respect to the ground, but attempts to confuse the factual issue of whether the axes of the HSCV meet the "horizontally disposed axes" limitation by conflating "horizontally disposed axes" with "horizontal cheese vats," arguing that since the HSCV falls in the general category of horizontal style cheese vats, its axes must therefore be "horizontally disposed." Tetra Pak's conclusion does not logically follow and ignores the undisputed fact that the axes of the HSCV are indeed inclined in relation to the floor on which it rests.

## VII.   The Asserted Claims of the '347 Patent Are Invalid

### A.     The '509 and '907 Patents Anticipate the '347 Patent

Tetra Pak's argument that the '559 and '907 patents (collectively referred to as "the '559 patent") do not disclose reorienting the agitator panels for counter-rotation and therefore do not anticipate the '347 patent ignores important disclosure in the '559 patent.

The '559 patent teaches that the agitator panels "can be arranged" for counter-rotation (A734), but Tetra Pak interprets the '559 patent as if it discloses only that agitator panels "can be counter-rotated." The district court embraced Tetra Pak's interpretation, finding that the '559 and '907 patents "say nothing about reorienting the panels." (A41).

18

The distinction between Tetra Pak's and the district court's interpretation and what the '559 patent actually says may be subtle, but it is important nonetheless. The '559 patent does not teach simply reversing the rotation of one of the agitator panels, which would result in the cutting edges of one panel being presented at the same time as the stirring edges of the other panel, as Tetra Pak and the district court concluded. Rather, the disclosure in the '559 patent that the panels "can be arranged" for counter-rotation instructs the reader that the panels should be re-arranged – or reconfigured – when the vat is to be operated in a counter-rotating mode.

The '559 patent further discloses how agitator panels in a cheese vat should be arranged. (A733). "The blades are sharpened on one side only and fixed in such a way that if the agitator means is rotated in one direction the sharp edges will be presented to the food product and cutting will take place, whereas, if the agitator means is rotated in the opposite direction the blunt edges of the blades will be presented to the food product and stirring will take place." *Id*. Tetra Pak does not address this disclosure or explain why counter-rotation would employ a configuration that differs from this convention.[3]

_____

[3] Tetra Pak's argument that there is no "predetermined convention" that requires independent cutting and stirring operations in cheesemaking is belied by the testimony of both Tetra Pak's expert (A1838) and CSI's expert (A834), and also by the teachings of the '559 patent. (A735-36) (explaining that the agitator panels are configured similar to prior art cheese vats so that cutting takes place when the

CSI's anticipation argument does not "rest[] on a single sentence" as Tetra Pak contends, but includes the entire '559 patent, which discloses all of the structural elements of the claims of the '347 patent. In addition, the '559 patent discloses that the agitator panels "can be arranged for counter-rotation," the "single sentence" to which Tetra Pak refers. Further, the '559 patent also discloses that agitator panels should be arranged so that only cutting edges are presented during the cutting operation and only stirring edges are presented during the stirring operation.

Thus, the '559 patent expressly discloses each and every limitation of claims 1 and 10. Alternatively, to the extent not expressly disclosed, re-arranging the agitator panels to accommodate counter-rotation is inherently disclosed. There are only two possible configurations – one in which the panels would simultaneously present cutting and stirring edges (which would not require any re-arranging of the agitator panels and would be contrary to the teachings of the '559 patent and the convention in the industry), and one in which the panels are re-arranged for counter-rotation so that only cutting edges are presented during the cutting operation and only stirring edges are presented during the stirring operation (which

---

panels are rotated in one direction and stirring takes place when the panels are rotated in the opposite direction; also explaining in detail the cheese making process that involves first cutting the coagulated mass and then stirring it).

is consistent with the teachings of the '559 patent and with the convention in the industry).

Further, Tetra Pak improperly attempts to interject a requirement of a motivation into the anticipation analysis by suggesting that CSI must demonstrate what "specific production criteria" would prompt configuring the '559 vat for counter-rotation. Beyond the fact that motivation is not relevant to anticipation, the four corners of the '559 patent explicitly disclose that the agitator panels can be arranged for counter-rotation.

Tetra Pak also attempts to distinguish the '559 patent by arguing that it discloses a food processing vat rather than a cheese vat. Semantics aside, the '559 patent clearly discloses a cheese vat. The abstract describes a "cheese processing vat." (A728). The Background section explains that "[t]he present invention relates . . . more particularly, to a food processing vat for production and processing of semi-liquid food products, such as cheese." (A733). The food processing vat of the '559 patent can be utilized "to make cheese…" (A735). Despite Tetra Pak's contrary argument, the '559 patent discloses a cheese vat.

 Tetra Pak further attempts to confuse the anticipation analysis by discussing the '504 patent, which discloses an embodiment in which some of the blades in the agitator panel are replaced by wires. While CSI does not dispute that some prior art cheese vats used wires in combination with blades, missing from Tetra Pak's

argument is any explanation of how the '504 disclosure concerning panels with wires affects the teaching in the '559 patent to present only the cutting edges of **blades** while cutting and only the stirring edges of **blades** while stirring.

The '559 patent discloses the same structural components as the '347 patent. As the district court noted, the dispositive issues are whether the prior art teaches (1) rotating the agitator panels in opposite directions, which the '559 patent does, and (2) flipping over all the panels on one axis so that they cut or stir only when rotated in opposite directions, which the '559 patent does. (A40). The '559 patent anticipates claims 1 and 10 of the '347 patent.

### B.    The '559 and '907 Patents Render the '347 Patent Obvious

The key question for the obviousness analysis is whether, if the '559 patent does not expressly or inherently disclose re-arranging the agitator panels so that only cutting edges are presented during cutting and only stirring edges are presented during stirring, such an arrangement would have been obvious to a person having ordinary skill in the art. The answer is yes, and it is fully supported by the evidence of record.

First, the '347 patent itself admits that the counter-rotating agitator panels are arranged "[i]n a manner generally similar to prior art cheese processing vats" so that the cutting edges are presented when the panels are rotated in one direction and the stirring edges are presented when the panels are rotated in the other

direction. (A64). Thus, the '347 patent itself admits that no "mental leap" was needed to arrange the agitator panels of a counter-rotating vat in accordance with the convention in the cheese industry.

Second, the '559 patent instructs that the agitators "can be arranged" for counter-rotation. There are only two ways to arrange the panels of the '559 patent: (1) to present only cutting edges or only stirring edges during rotation, or (2) to present both cutting edges and stirring edges during rotation. Even if a person having ordinary skill in the art would not have understood the fundamental convention used in the cheese making process, arriving at the counter-rotating cheese vat claimed in the '347 patent would be the result of routine experimentation in configuring the vat.  It is one of the only two options available.

Third, both Tetra Pak's and CSI's experts testified that a person having ordinary skill in the art would understand that the agitator panels should not be arranged to cut and stir at the same time. (A1838; A834). Thus, the general knowledge of a person having ordinary skill in the art combined with the teachings of the '559 patent would result in the cheese vat claimed in the '347 patent.

Tetra Pak wrongly argues that CSI must demonstrate some motivation for configuring the vat of the '559 patent for counter-rotation. That is not the question – the '559 patent explicitly contemplates counter-rotation. The question is whether a person having ordinary skill in the art would arrange the panels so that only

cutting edges or only stirring edges are presented during rotation. As explained above, the answer to this question is yes.

Finally, Tetra Pak's reliance on *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398 (2007), and its discussion of *United States v. Adams*, 383 U.S. 39 (1966), is misplaced. In *Adams*, though the prior art disclosed each of the claimed elements, it taught away from combining the elements. Here, Tetra Pak has not identified any prior art that teaches that agitator panels with blades **should not** be arranged to present only cutting edges or only stirring edges during rotation. Instead, the prior art teaches this very arrangement. Thus, *Adams* is inapplicable.

### C.    The AT '523 Patent Renders the '347 Patent Obvious

The AT '523 patent discloses a counter-rotating vertical vat. The '347 patent admits that people in the industry were turning vats on their side and operating them in horizontal mode, thus providing the motivation for a person having ordinary skill in the art to operate the AT '523 counter-rotating vat in a horizontal mode.

Tetra Pak argues that the '347 patent teaches away from this, but the "teaching away" doctrine applies to prior art, which does not include the '347 patent.[4]  While CSI is relying on the admission in the '347 patent regarding the

---

[4] Tetra Pak further wrongly relies upon *Akzo N.V. v. U.S. Int'l Trade Comm'n*, 808 F.2d 1471 (Fed. Cir. 1986), which is directed to *prior art* references that teach away.

practice of operating vertical vats in a horizontal mode, the other purported

teachings in the '347 patent have no bearing on this admission. Tetra Pak has not

identified anything in the prior art teaching that vertical vat design cannot be

implemented into a horizontal vat.

Further, Tetra Pak's arguments relating to the AT '523 patent are premised

upon a complete misunderstanding as to what is disclosed. Tetra Pak believes that

the following excerpt from its translation of the AT '523 patent describes the vat as

having agitators that rotate in the same direction:

> [t]he shafts (2 and 3) are connected to these arranged frames
> (4,5) with gearbox (7) that can be operated in either revolving
> direction, whereby the clockwise revolving direction is noted as
> the cutting direction and the counterclockwise revolving
> direction is noted as the stirring direction.

(A1049). This paragraph simply explains that the **gearbox** can be operated in

either revolving direction: when revolving clockwise, the agitator panels cut; when

revolving counterclockwise, the agitator panels stir.

Tetra Pak's misunderstanding of the AT '523 patent is further highlighted by

the figures showing panels that counter-rotate. This is readily apparent in Figure 2,

where the agitation panels 12 (described as a "valve" in the translation) flare away

from the stirring faces of the agitator panels, meaning that the panels are moving

toward each other (i.e., counter-rotating). (A1057). This is further supported by

Tetra Pak's translation, which describes the agitation panels 12 (or valves) as

25

swinging free and facing backwards when the agitator is moved in the cutting direction and being positioned on the frame surface when the agitator is moved in the cutting direction. (A1050). These two positions are illustrated in Fig. 8. (A1059).

Tetra Pak's argument as to the AT '523 patent is based upon a complete misunderstanding of what is disclosed. Likewise, the district court failed to recognize that the AT '523 patent discloses a counter-rotating cheese vat, which is readily apparent from the figures and from Tetra Pak's translation. The '347 patent admits that people in the industry were incorporating vertical vat technology into horizontal vats, i.e., by "flipping" the vertical vats on their sides. Following this practice in the industry, a person having ordinary skill in the art could simply turn the AT '523 vat on its side to arrive at the vat claimed in the '347 patent.

## VIII. Tetra Pak Was Not Prejudiced by the Stricken Expert Testimony

In his initial expert report, Mr. Jay explained that the AT '523 patent discloses a counter-rotating vertical cheese vat where only the cutting edges are presented during the cutting operation and only the stirring edges are presented during the stirring operation. (A848). Tetra Pak subsequently deposed Mr. Jay regarding the AT '523 patent and also submitted rebuttal testimony from Dr. McMahon. Tetra Pak's investigation of Mr. Jay's opinion during his deposition and its submission of Dr. McMahon's rebuttal testimony undercut Tetra Pak's bald

assertion that "harm here is undeniable." (Tetra Pak Br. 60). The district court abused its discretion in striking Mr. Jay's declaration testimony relating to the AT '523 patent.

## CONCLUSION

For all the foregoing reasons, and for the reasons set forth in its principal brief, CSI respectfully requests (1) that the district court's judgment of infringement that the CSI HSCV infringes claims 1 and 10 of the '347 patent be reversed and that judgment be entered in CSI's favor that the CSI HSCV does not infringe any of the asserted claims of the '347 patent; (2) that the district court's judgment that CSI failed to establish the invalidity of the '347 patent over the prior art be reversed and that judgment be entered in CSI's favor that claims 1 and 10 are invalid; (3) that the permanent injunction based on the district court's grant of summary judgment of infringement be vacated; and (4) that the district court's exclusion of CSI's expert testimony be reversed.

Respectfully submitted,

/s/Michael T. Griggs
James F. Boyle
John P. Fredrickson
Michael T. Griggs
Eric J. Lalor
Boyle Fredrickson, S.C.
840 N. Plankinton Avenue
Milwaukee, WI 53203
(414) 225-9755

                                                      Attorneys for Plaintiff/Counterclaim
Defendant-Appellant
Cheese Systems, Inc. and
Counterclaim Defendant-Appellant
October 29, 2012                              Custom Fabricating & Repair, Inc.

## PROOF OF SERVICE

I, Michael T. Griggs, hereby certify that I have this day caused the BRIEF OF

APPELLANTS CHEESE SYSTEMS, INC. and CUSTOM FABRICATING &

REPAIR, INC., to be served on counsel of record as noted below:


Philip L. Hirschhorn   (via email: *philip.hirschhorn@bipc.com*)
Buchanan Ingersoll & Rooney PC
1290 Avenue of the Americas, 30th Flr.
New York, New York 10401


Date:  10/29/12                            /s/ Michael T. Griggs

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B). The brief contains 6,489 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

This brief also complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6). The brief has been prepared in a proportionally spaced typeface using Microsoft Word 2007, in 14 point Times New Roman.

Date:  10/29/12            /s/ Michael T. Griggs

                    Attorneys for Plaintiff/Counterclaim
                    Defendant-Appellant
                    Cheese Systems, Inc. and
                    Counterclaim Defendant-Appellant
                    Custom Fabricating & Repair, Inc.